Lewis v. HHS                          CV-92-252-B     08/09/93

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

Larry T. Lewis

        v.                              Civil No. 92-252-B

Secretary of Health and Human Services


**O R D E R**

In this action, Larry Lewis ("claimant") challenges a final determination by the defendant Secretary of Health and Human Services ("Secretary"), denying his application for Social Security disability benefits.  The court has jurisdiction pursuant to 42 U.S.C.A. § 405(g) (West Supp. 1993).  Currently before the court are Plaintiff's Motion to Reverse Decision of the Secretary (document no. 10) and Defendant's Motion for Order Affirming the Decision of the Secretary (document no 9).


## I.   STANDARD OF REVIEW

Pursuant to 42 U.S.C.A. § 405(g) (West Supp. 1993), the court is empowered to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause

for a rehearing."  In reviewing a Social Security decision, the factual findings of the Secretary "shall be conclusive if supported by 'substantial evidence.'"  Irlanda Ortiz v. Secretary of Health & Human Serv., 955 F.2d 765, 769 (1st Cir. 1992) (quoting 42 U.S.C. § 405(g)).  The court must "'uphold the Secretary's findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Secretary's] conclusion.'"  Id. (quoting Rodriguez v. Secretary of Health & Human Serv., 647 F.2d 218, 222 (1st Cir. 1981)).  It is the Secretary's responsibility to "determine issues of credibility and to draw inferences from the record evidence."  Irlanda Ortiz, 955 F.2d at 769 (citing Rodriguez, 647 F.2d at 222).  Moreover, "the resolution of conflicts in the evidence is for the Secretary, not the courts."  Id. (citing Rodriguez, 647 F.2d at 222).

## II.  BACKGROUND

Claimant was born on May 5, 1942, Record ("R.") 129, and currently resides in Manchester, New Hampshire.  Complaint ¶ 1.  He has a high school education, R. 136, and has previously worked in concrete block manufacturing and as a steel press

2

operator. R. 74-75, 136.[1] Claimant seeks disability benefits from "February 2, 1986 up through and including the present date . . . ." Complaint ¶ IV. He alleges disability due to lung disease, asthma, bilateral upper extremity conditions, a right leg condition, and cellulitis. R. 132[2].

A. Medical History

1. Breathing complaints

The medical records indicate that claimant had part of his left lung removed in 1981. R. 220, 240. Subsequent x-rays and EKG reports were normal, see R. 208-09, and claimant showed no respiratory distress upon physical examination. R. 221. A pulmonary function test in 1988 revealed some evidence of moderate obstruction, but the physician noted that there was "significant improvement" after claimant used a brocholdilator.

---

[1]Claimant worked for a steel company as a machine and steel press operator from 1973 until 1982. R. 73-74, 136. He then worked as a self-employed steel press operator and concrete block manufacture from 1982 until 1986. R. 75. Finally, in February 1986, claimant joined Gilbert Block, a company which manufactured concrete blocks. R. 75, 136.

[2]Cellulitis is an acute inflammation of soft and connective tissues under the skin. Dorland's Illustrated Medical Dictionary 299 (27th ed. 1988) [hereinafter Dorland's].

3

R. 274-79.[3]

    2.  <u>Extremities complaints</u>

Subsequent to a work-related injury, claimant underwent
treatment in February 1986 for a cellulitis infection on his
right forearm and hand.  R. 181.  Shortly after being discharged
from the hospital, claimant reinjured his arm and began to
complain of pain and numbness.  R. 181-82.  An examination in
April 1986 revealed that claimant's right grip pressure was
slightly below normal, but that strength was equal in all muscle
groups and sensation was intact.  R. 182-83.  Electromyography
and nerve conductive tests on claimant's upper extremities were
also normal.  R. 184.  By August 1986, claimant reported some
relief from pain in his right hand, but stated that he continued
to have a "charlie horse" feeling in his right forearm when he
grasped or lifted objects.  R. 191.

On October 22, 1986, claimant injured his left shoulder in
an automobile accident.  R. 146, 236.  During subsequent

_____

    [3]On September 19, 1989, after the expiration of his insured
status, claimant complained during a pulmonary examination of
shortness of breath whenever he does something beyond a "slow
pace."  R. 296.  While the test showed "severe obstructive
airflow," it also revealed a "significant response" to a
bronchodilator.  R. 296.

4

examinations, claimant complained of pain in his left shoulder and a continuing "charlie horse" sensation in his right forearm, R. 196-97, but showed no limitation of neck motion. R. 194. He was prescribed analgesic medications and was required to use a transcutaneous electrical nerve stimulator ("TENS unit"). R. 197. One physician advised that claimant should "[l]ook for work not involving cement, which was associated with his cellulitis," and noted that claimant's rehabilitation goal was to return to work as a steel press operator. R. 198. Claimant's complaints of pain continued and an examination of the interior portion of the joint revealed a glenoid fracture and a partial or incomplete dislocation of the shoulder. R. 211-15.[4]

During an examination in September 1987, claimant stated that he had no shoulder pain, but felt a sense of impending dislocation when lifting heavy objects over his head. R. 215. One month later, after being diagnosed with an "[a]nterior labral tear," claimant underwent a left shoulder arthroscopy to reshape

---

[4]In July 1987, claimant underwent hypnotic procedures to attempt to lessen his pain. R. 214. Hospital notes indicate that the tests showed that this approach might be effective. R. 214.

5

the shoulder blade region. R. 220.[5] He returned to the recovery room "in stable condition with normal neurosensory function." R. 225.

Claimant began physical therapy after the arthroscopic procedure, but complained that his shoulder was "much worse than before [the] surgery." R. 230. Two months later, however, claimant's treating sources noted that the TENS unit and exercise program had "restored very nearly normal [r]ange of [m]otion and function of his upper extremities," R. 236, and intimated that his remaining complaints could be corrected by continued therapy. R. 236-37. A later report observed that while claimant's shoulder had full motion, he still complained of severe pain. R. 240. The report added:

> 4) [Claimant]'s right upper extremity is impaired 50 percent in terms of doing heavy repetitive work that he did prior to his industrial injury of [February] 1986.
>
> 5) The complete lack of objective findings of impairment of the right upper extremity on physical examination today strongly suggests that [claimant] would be capable of doing work with his right upper extremity not involving heavy lifting or repetitive motion.

---

[5]Arthroscopy is an examination of the interior portion of a joint. Dorland's, supra note 2, at 149.

R. 243.

On January 4, 1988, claimant underwent a general medical examination at the request of the New Hampshire Division of Vocational Rehabilitation. R. 272-73. He displayed no weakness with respect to his nervous system, and his sensation was normal. R. 273. Although claimant was diagnosed with post-infectious neuritis of the right arm and post-traumatic arthritis of the left shoulder, the examining physician only noted that claimant should avoid repetitive movements with his left arm and hand. R. 273.

During the next several months, from June through November 1989, claimant reported intermittent pain with the use of his arm, R. 260, 267, but he was able to obtain some relief from the TENS unit. R. 262, 267. An x-ray taken on September 22, 1989 revealed no evidence of dislocation or compression fracture in the upper dorsal vertebral body and no significant change since September 24, 1987. R. 265. One of claimant's physicians wrote a letter indicating that claimant could participate in a vocational rehabilitation program, but that he should avoid "heavy lifting or repetitive activities" with his left shoulder. R. 281.

7

In a June 6, 1989 examination, claimant once again stated that his shoulder was causing him pain. R. 295. The physician observed some deltoid atrophy. R. 295. Six months later, the physician noted minimal tenderness and commented that certain additional surgical procedures were not recommended because claimant was "young" and was "functioning with tolerable pain." R. 312. On October 29, 1990, claimant underwent a procedure to reduce the pressure in the region just below his left shoulder blade. R. 365.[6]

B. Procedural History

Claimant filed an application for disability insurance benefits on July 18, 1988. R. 129-31. The claim was initially denied on November 2, 1988, R. 140-41, and a request for reconsideration was filed on or about January 25, 1989. R. 149. The request for reconsideration was denied on April 27, 1989. R. 157-58. Claimant then requested, and received, a hearing before

---

[6]The record indicates that claimant has a history of alcohol abuse, R. 183, 193, 242, but he did not allege that this condition was disabling for purposes of the Social Security Act. See R. 267 (clinical psychologist noted in November 1988 that claimant had been sober for the previous five months); R. 248 (medical note dated January 27, 1988, states that claimant has abstained from alcohol for the previous ten months).

an Administrative Law Judge (ALJ).  R. 313-20.[7]  However, the ALJ

[7]In the Notice of Hearing, R. 35, claimant was informed that he could designate a person to represent him.  R. 36.  The notice added:

> If you are represented and your representative wishes to charge a fee, such fee is subject to approval by [the ALJ] and the Office of Hearings and Appeals. Your representative must furnish you with a copy of the fee petition.  When you receive your copy of the fee petition, you will have 20 days to comment, if you wish, regarding the requested fee.  If you are found entitled to past-due benefits . . . and your representative is an attorney who intends to charge a fee, 25 percent of such past-due benefits will be withheld by the Social Security Administration pending receipt of a petition from the attorney and approval of a fee by the Office of Hearings and Appeals. If the approved fee is less than 25 percent withheld, the amount of the fee will be paid to your attorney from the amount withheld and the difference will be sent to you.  If the approved fee is more than 25 percent of your past-due benefits, the 25 percent of your past-due benefits withheld will be paid to your attorney and the difference is a matter to be settled between you and your attorney.

R. 36.  Another document confirms that claimant was

> previously advised of [his] right to be represented by an attorney or other individual of [his] choice.  In an effort to assist [him] to obtain representation, [he] was furnished a list of organizations in [his] community.  Some of these organizations may be able to refer [him] to a

found that claimant was not entitled to disability benefits.  R.

313-20.[8]

     On December 27, 1990, the Appeals Council vacated the

_____

          representative who will charge a fee only if
          [he] is found entitled to benefits.  Some may
          be able to represent [him] without charge if
          [he qualifies] for free legal services.

R. 37.  At the April 24, 1990 hearing, the following exchange
between the ALJ and the claimant took place:

     ALJ:      The claimant is present today and unrepresented,
               and you know of your right to representation?  We
               wrote to you.

     CLMT:     Yes.

     ALJ:      You understand.  Fine. . . .

R. 44.

     [8]Prior to the hearing, claimant was advised as follows:

          Before the date of the hearing you should
          submit any additional evidence that you wish
          to have considered by the Administrative Law
          Judge.  In this way, the preparation of your
          case will be helped.  However, if such
          evidence is submitted on the date of the
          hearing or within such additional time as the
          Administrative Law Judge will provide, it
          will still be carefully considered.

R. 40.  In a letter dated April 2, 1990, the ALJ again informed
the claimant that if he had any recent hospital or doctor's
report "or any other document you want me to consider," he should
forward them to the ALJ.  R. 41.

decision and remanded the matter to the ALJ to consider new evidence and to obtain the testimony of a vocational expert. R. 327.[9] On or about April 1, 1991, claimant received the following notice:

> If you are represented and your
> representative wishes to charge a fee, such
> fee is subject to approval by [the ALJ] and
> the Office of Hearings and Appeals. Your
> representative must furnish you with a copy
> of the fee petition. When you receive your
> copy of the fee petition, you will have 20
> days to comment, if you wish, regarding the
> requested fee. If you are found entitled to
> past-due benefits . . . and your
> representative is an attorney who intends to
> charge a fee, 25 percent of such past-due
> benefits will be withheld by the Social

---

[9]The new evidence included a vocational evaluation report, R. 343-49, psychological assessments, R. 340-42, and a medical report from claimant's treating orthopedist, Dr. John Harris, dated July 30, 1990, which stated:

> [Claimant] is currently restricted in that
> his left arm can be used from waist to chest
> height, but can not be used at or above the
> height of his shoulders. His left arm can
> perform fine manipulations and manage weights
> up to approximately 3 to 5 pounds within the
> working range noted above. I would
> anticipate that he would have some fatigue
> problem with the drafting manual arts, but
> that the shoulder ought to be capable of
> maintaining the degree of motion necessary to
> work at a drafting board.

R. 350.

> Security Administration pending receipt of a
> petition from the attorney and approval of a
> fee by the Office of Hearings and Appeals.
> If the approved fee is less than 25 percent
> withheld, the amount of the fee will be paid
> to your attorney from the amount withheld and
> the difference will be sent to you.  If the
> approved fee is more than 25 percent of your
> past-due benefits, the 25 percent of your
> past-due benefits withheld will be paid to
> your attorney and the difference is a matter
> to be settled between you and your attorney.

R. 31.

The ALJ held a hearing on April 23, 1991 and heard testimony from claimant and a vocational expert ("VE").  R. 62-128.  The following colloquy took place between the ALJ and claimant at the start of the hearing:

ALJ:    The -- in the notices that -- the other notices
        that you got from the, from the Administration,
        and from my notice, [you were] . . . advised that
        you have a right to be represented at these
        hearings.  Are you aware of that right?

CLMT:   Yes.

ALJ:    Now, as Judge, I'm not, I'm not -- I don't take
        the position that you have to be represented or
        you don't have to be represented.  I have to make
        sure that that right is fully protected.  You have
        a right to -- you have the additional right to
        waive that right and proceed to the hearing on
        your own if you wish.  Have you considered this
        particular situation as far as representation?

CLMT:   Well, I don't have anybody, because I can't afford
        anybody.

12

> ALJ:     Uh-huh.  Well, I mean it's your decision. . . .
>          [Y]ou don't have to give me a reason for it, but
>          I'm saying . . . do you want to proceed with the
>          hearing today?
>
> CLMT:    Sure.  Yeah.

R. 65.  The ALJ then allowed claimant to introduce several documents (medical reports, medication list, physical rehabilitation report) into evidence.  R. 66.

Claimant stated at the hearing that his breathing condition was his worst ailment, but explained that he does not have any breathing problems while at rest.  R. 78.  He added that he has delayed response when using his arm to lift objects,[10] but claimed that once lifted, he could maintain grasp of the objects. R. 80.  Claimant stated that he could lift five to ten pounds, R. 91, and could probably sit all day without having to change his position.  R. 90.[11]  The VE testified as follows:

    (1)  claimant's past jobs were semi-skilled and involved
         medium to heavy exertion;

---

[10]To illustrate his point, claimant asserted that if he wanted to reach for a cup of coffee, for example, it would take a few moments for his arm to react to his command.  R. 79-80.

[11]Claimant also stated that he takes medications, which make him "[s]leepy, drowsy, drunky," for asthma, R. 82, and that his drinking was "[n]ot too bad."  R. 88 (claimant added that while he occasionally takes a drink, he does attend Alcoholics Anonymous "every now and then").

(2)    if a person with claimant's educational and vocational background could only do light functional work, he would not be able to return to his past relevant work; the VE added, however, that there were a series of "light machine operating jobs" which the person would be able to perform;[12]

(3)    if that person were unable "to do work involving any heavy lifting or great exertion with his right upper extremity" and is incapable of repetitive movement with the left arm and hand, he would not be able to return to his past relevant work and would be precluded from performing the jobs mentioned above;

(4)    if that person's only restrictions were "no repetitive movements of the left arm and hand," he also would be unable to perform the jobs mentioned above; the VE, however, added that other light work, not requiring full bilateral hand and arm use, existed in the national economy;[13]

(5)    if that person had a light exertional capacity, but was required to avoid heavy lifting and repetitive activity with the left shoulder, he would be able to work as a production inspector or security guard;

(6)    if that person had the residual capacity for sedentary work, he would not be able to return to his past relevant work but he would be to perform several jobs

_____

[12]These jobs included (1) milling and planning machine operator; (2) punching and stamping machine operator; (3) drilling and boring machine operator; (4) grinding, buffing, and polishing machine operator; and (5) slicing and cutting machine operator. R. 104.

[13]The VE named production inspection jobs such as checker and quality control worker as examples. R. 106-07.

in the national economy;[14]

    (7) finally, in response to a hypothetical posed by
    claimant, the VE stated that if the person had his
    shoulder fused, limiting his use to one arm, he would
    be able to perform unskilled, light, and sedentary
    positions such as security guard and gas station
    attendant.

R. 102-17.[15]

Subsequent to the April 23, 1991 hearing, the ALJ solicited

additional evidence from the VA Medical Center in Boston,

Massachusetts, and provided claimant with an opportunity both to

comment on the new evidence and to submit any additional

information. R. 29, 364-65. After evaluating the documents

identified in the record and considering the testimony and

arguments presented, the ALJ rendered his decision on May 24,

1991, denying claimant's application for disability benefits. R.

21-27. Among other things, the ALJ found:

    (1) claimant met the disability insured status requirements
        on February 2, 1986, the date he stated he became

---

[14]These jobs included (1) assembler; (2) grader and sorter;
(3) punching and stamping press operator; (4) grinding, buffing,
and polishing machine operator; (5) printing machine operator;
and (6) painting and spray-painting machine operator. R. 109.

[15]During the VE's testimony claimant stated that he was
"getting a little confused." R. 110. The ALJ then explained the
VE's role and informed claimant that he would have an opportunity
to ask questions. R. 110-11.

15

unable to work, and continued to meet them through March 31, 1989;

(2)   the medical record "does not reflect significant pathology of the lungs and does not show significant resultant limitations in the ability to perform basic work activities;" moreover, although the record "does establish medically determinable impairments of bronchitis and asthma it does not show that these conditions impose more than a minimal affect" on claimant's ability to work;

(3)   while the record reveals a history of alcohol abuse, it "does not show a continuing alcohol abuse disorder and does not show any limitations in the ability to perform basic work activities;" thus, "no severe impairment of alcohol abuse is found;"

(4)   claimant does not allege disability due to mental impairments and the evidence shows no diagnosis of a severe mental impairment;[16]

(5)   the medical evidence establishes that claimant has severe degenerative joint disease of the left shoulder and degenerative disc disease of the cervical spine, but that he does not have an impairment or combination of impairments listed in, or medically equivalent to, one listed in Appendix 1, Subpart P, Regulations No. 4;

(6)   however, claimant's "impairments in combination prohibit him from performing his past relevant work because these positions involved heavy lifting;"

---

[16]While a psychologist noted in October 1989 that claimant "does least well on tasks requiring concentration," R. 341, the ALJ held that "this assessment was made several months after the date he was last insured for disability insurance benefits" and "does not reflect a discrete psychological impairment." R. 24. The psychologist, moreover, added that claimant "should be able to handle the intellectual demands of a post-secondary educational program." R. 341.

16

(7)    claimant "has no impairments in his ability to sit, stand and walk;"[17]

(8)    the assessment of claimant's treating physician, Dr. Harris, was used as the basis of a hypothetical question posed to the VE; the record does not show total disability with this assessment; Dr. Harris noted that claimant's impairments limited him in the use of his left arm in performing tasks at or above shoulder height;[18] and

(9)    while this assessment shows limitations relating to the use of the left upper extremity, the VE identified four types of work positions which claimant could perform; even if claimant could not handle prolonged standing and/or walking, he could perform the following jobs which exist in the national economy in significant numbers: (i) production tester; (ii) production inspector; (iii) assembler; and (iv) grader-sorter.

R. 22-27.

On March 5, 1992, the Appeals Council denied claimant's request for further review, R. 5, making the ALJ's May 24, 1991 decision the final decision of the Secretary. Claimant filed this suit on or about May 21, 1992. See Document no. 3.

---

[17]Claimant testified that he walked a one-mile distance to attend the April 23, 1991 hearing. R. 70; see also R. 331 (vocational counselor noted that claimant walked "several miles" to attend a May 30, 1989 evaluation session).

[18]During the hearing claimant demonstrated that he could extend his hands parallel to the table in a seated position, but that he "seemed to have a little difficulty with the left arm." R. 92 (ALJ also noted that the left arm "doesn't seem as flexible" as the right arm).

17

## II. <u>DISCUSSION</u>

### A. <u>Arguments</u>

Claimant raises several issues in his motion for remand. First, he argues that he did not "knowingly and intelligently understand or waive his right" to be represented "by competent counsel of his choice" at the hearing. In conjunction therewith, he maintains that (1) he was never fully informed of the benefits of legal representation or the possibility of contingency arrangements for private counsel and that (2) his level of comprehension was greatly diminished by the affects of alcohol and pain medications. Second, he asserts that the ALJ "failed in his affirmative obligation" to assist him, as a pro se claimant, by "fully and fairly developing the record." Specifically, he contends that the ALJ (1) neglected to inquire as to whether or not claimant had secured all the necessary medical and vocational evidence and (2) failed to obtain the remainder of a recent psychological report prepared by Dr. Toye. Finally, he argues that the Secretary did not establish that a significant number of jobs existed in the national economy that the claimant was capable of performing because the hypotheticals provided to the VE on this point did not "adequately describe" all of his "impairments." However, since I conclude that a remand is

18

required because claimant did not knowingly and intelligently waive his right to be represented by counsel, I will only address his remaining arguments insofar as they bear on the issue of whether he was prejudiced by not having counsel present at the hearing.

B.  Analysis

Claimants have a statutory right to counsel at disability hearings.  See 42 U.S.C. § 406; see also 20 C.F.R. § 404.1705. But see Evangelista v. Secretary of Health & Human Serv., 826 F.2d 136, 142 (1st Cir. 1987) (right to counsel in disability cases "falls well below the Sixth Amendment threshold" found in criminal cases).  Claimants must be properly notified of this right, but may waive it if provided with sufficient information to intelligently decide whether to retain counsel or proceed pro se.  See Evangelista, 826 F.2d at 142; see also Edwards v. Secretary of Health & Human Serv., 937 F.2d 580, 585-86 (11th Cir. 1991); Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990); Holland v. Secretary of Health & Human Serv., 764 F.2d 1560, 1562-63 (11th Cir. 1985).  The type of information that must be set forth in a notice to claimants concerning the right to counsel includes:

19

(1)   a description of the benefits to be derived from representation by competent counsel;

(2)   the identity of legal service organizations that will represent qualifying claimants without charge;

(3)   the fact that attorneys will sometimes agree to represent claimants on a contingency fee basis; and

(4)   the existence of a statutory ceiling of twenty-five percent on attorney's fee payments that may be paid from an award of past benefits and a requirement that such fees be subject to court approval.

See, e.g., Thompson v. Secretary of Health & Human Serv., 933 F.2d 581, 584-85 (7th Cir. 1991); Edwards, 937 F.2d at 585-86; Holland, 764 F.2d at 1563; Smith v. Secretary of Health & Human Serv., 677 F.2d 826, 829 (11th Cir. 1982).  However, a flaw in the notice does not automatically require that the case be remanded.  Rather, claimants must show that they were prejudiced by their lack of representation.  See Evangelista, 826 F.2d at 142; see also Edwards, 937 F.2d at 586; Kane v. Secretary of Health & Human Serv., 731 F.2d 1216, 1220 (5th Cir. 1984); Smith, 677 F.2d at 829-30.

In the present case, claimant received satisfactory written notice of his right to counsel prior to the hearing. Nevertheless, the ALJ's inquiry of the claimant was not sufficient to establish that claimant's decision to proceed without counsel was "knowing and intelligent."  When the ALJ

20

asked claimant if he had considered whether he should be represented by counsel, claimant responded, "Well, I don't have anybody [at the hearing] because I can't afford anybody." Since the ALJ failed to follow up on this issue, the record does not disclose whether or not the claimant understood that he might have been able to find an attorney who would have represented him for free or on a contingency fee basis.

This case is indistinguishable from Thompson, a Seventh Circuit decision in which the Court of Appeals remanded a disability case in part because the claimant had not knowingly and intelligently waived his right to counsel. 933 F.2d at 584-85. In Thompson, as in the present case, the claimant informed the ALJ that he did not have an attorney because he could not afford one. Id. Although the Thompson claimant had previously been informed in writing of the availability of free counsel, the court held that the ALJ's failure to establish that the claimant understood this option invalidated his waiver of counsel. Id. I find Thompson persuasive and on point. Accordingly, I agree with claimant that the record does not establish that he knowingly and intelligently waived his right to counsel.

I also conclude that claimant was prejudiced by the absence of counsel. The record establishes that claimant suffers from

21

multiple impairments.  Although the ALJ determined that claimant's pulmonary problem had only a minimal effect on his ability to work, that his alcohol disorder did not limit his ability to perform basic work activities, and that any mental impairment affecting the claimant's ability to concentrate had no effect on his employability, the ALJ's failure to fully develop the record with respect to these impairments supports claimant's argument that he was prejudiced by the absence of counsel.  See Smith, 677 F.2d at 826; see also Thompson, 933 F.2d at 585-88; Robinson v. Secretary of Health & Human Serv., 733 F.2d 255, 257-56 (2d 1984).  Further, the failure of the ALJ to include his findings with respect to these impairments in the hypothetical questions he posed to the VE calls into question the validity of the VE's testimony that jobs existed in the national economy that claimant was capable of performing.  See Arocho v. Secretary of Health & Human Serv., 670 F.2d 374, 375-76 (1st Cir. 1982).  Had claimant been represented by counsel, these deficiencies would undoubtedly have been corrected and a different result might well have been reached by the ALJ.  Accordingly, I find sufficient prejudice to the claimant to require a remand.

22

### III. <u>CONCLUSION</u>

The Secretary's decision is vacated and this matter is remanded for a new hearing consistent with this order.

SO ORDERED.


_____
Paul Barbadoro
United States District Judge

August 9, 1993


cc:  Raymond J. Kelly, Esq.
     Gretchen L. Witt, Esq.